FILED

SB

**UNITED STATES DISTRICT COURT** 2017 MAR 27  AM 9: 11
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS FLORIDA

| | |
|---|---|
| **UNITED STATES OF AMERICA, EX REL. SANDRA PILARSKI**, an individual, <br><br> Plaintiff, <br><br> v. <br><br> **ARHC BTFMYFL01 TRS LLC d/b/a BARRINGTON TERRACE OF FORT MYERS**, a Delaware limited liability company, **TERESA KEATING**, an individual, **MADISON SERVICES GROUP, LLC**, a Georgia limited liability company, **ARBOR CO.**, a Georgia company, **ARBOR HOLDINGS, LLC**, a Georgia limited liability company, **HOPE HOSPICE AND COMMUNITY SERVICES, INC.**, a Florida corporation, and several unknown physicians, <br><br> Defendants. | **CIVIL ACTION** <br><br> Case No.  2:17-cv- 168-FtM-99MRM <br><br> **Judge:** <br><br> **Mag. Judge:** <br><br> **FILED *IN CAMERA* AND UNDER SEAL** |

## COMPLAINT FOR DAMAGES AND OTHER RELIEF UNDER THE QUI TAM PROVISIONS OF THE FEDERAL FALSE CLAIMS ACT AND DEMAND FOR JURY TRIAL

NOW COMES the Relator/Plaintiff, **SANDRA PILARSKI** ("PILARSKI"), by and through undersigned counsel, on behalf of the United States of America ("United States") and brings this action against **ARHC BTFMYFL01 TRS LLC d/b/a BARRINGTON TERRACE OF FORT MYERS** ("BTFM"), **TERESA KEATING** ("KEATING"), **MADISON SERVICES GROUP, LLC** ("MADISON"), **ARBOR CO.** ("ARBOR"), **ARBOR HOLDINGS, LLC** ("HOLDINGS"), **HOPE HOSPICE AND COMMUNITY SERVICES, INC.** ("HOSPICE"), and several unknown physicians (collectively "Defendants"), under the False Claims Act, 31 U.S.C. §3729 et. seq. ("FCA"), and in support of the Complaint, the Relator alleges as follows:

1

S-2

## CAUSES OF ACTION

1.      This is an action to recover damages and civil penalties on behalf of the United States against the Defendants for submitting and causing to be submitted false claims to the United States under the government healthcare program, Medicare and Medicaid ("Program"), from the past six (6) years through present ("Relevant Period").

2.      During the Relevant Period, Defendants have fraudulently and systematically billed and/or caused to be billed and, upon information and belief, continues to bill and submit claims and/or cause bills and claims to be submitted to Government Healthcare Programs that are false or fraudulent and/or contain false and fraudulent misrepresentations regarding diagnoses and types and extent of services rendered, the medical necessity of such services. The Defendants have submitted and/or caused to be submitted false claims to receive monies from the Program knowing of the falsity of such claim and the false and fraudulent misrepresentations contained therein.

3.      During the Relevant Period, **HOPE**, the exclusive hospice provider in Lee County, Florida, fraudulently and systematically reviewed, approved and submitted and/or caused to be submitted billings for services allegedly provided, and upon information and belief, other health services providers, knowing it was unnecessary and contained false and fraudulent misrepresentations, including false diagnoses.

4.      During the Relevant Period, several unknown physicians fraudulently and systematically reviewed, approved and submitted and/or caused to be submitted billings for services allegedly provided knowing it was unnecessary and contained false and fraudulent misrepresentations, including false diagnoses.

2

5.      During the Relevant Period, **BTFM** assisted **HOPE** in fraudulently and systematically reviewing, approving and/or assisting in the submission of billings for services allegedly provided, and upon information and belief, other health services providers, knowing it was unnecessary and contained false and fraudulent misrepresentations, including false diagnoses.

6.      During the Relevant Period, **KEATING**, the administrator of **BTFM**, assisted **HOPE** in fraudulently and systematically reviewing, approving and/or assisting in the submission of billings for services allegedly provided, and upon information and belief, other health services providers, knowing it was unnecessary and contained false and fraudulent misrepresentations, including false diagnoses. **KEATING** has encouraged and insured the continuation of the fraudulent practices and false billing.

7.      During the Relevant Period, **MADISON**, the management company of **BTFM**, assisted **HOPE** in fraudulently and systematically reviewing, approving and/or assisting in the submission of billings for services allegedly provided, and upon information and belief, other health services providers, knowing it was unnecessary and contained false and fraudulent misrepresentations, including false diagnoses.

8.      During the Relevant Period, **HOLDINGS**, the parent company to **BTFM** and **MADISON**, which operates at least 30 assisted living facilities in 11 states, has knowingly reaped the financial rewards from fraudulent billings by **HOPE** for services allegedly provided by its facilities, and upon information and belief, other health services providers, knowing such monies were derived from false and fraudulent misrepresentations, including false diagnoses.

9.      The Defendants perpetrated these schemes in order to increase billings to and receive revenue from Government Health Care Programs to which they were not entitled.

10.     During the Relevant Period, Defendants has received monies from the Program as a direct and proximate result of its fraudulent claims submitted to the Program and the false and fraudulent misrepresentations contained therein.

11.     Defendants perpetrated this scheme in order to obtain monies from the Program for business and personal profit.

## JURISDICTION AND VENUE

12.     These claims arise under the Qui Tam provisions of the FCA. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and 31 U.S.C. §3732 which specifically confer jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§3729 and 3730.

13.     Personal jurisdiction and venue for this action are predicated on 31 U.S.C. §3732(a) which provides: "any action brought under §3720 may be brought in any judicial district in which the defendant, or in the case of multiple defendants, any one defendant, can be found, resides, transacts business or in which any act proscribed by §3729 occurred." All of the Defendants conduct business in, among other places, Lee County, Florida, which is within the Middle District of Florida, Ft. Myers Division. **KEATING** is domiciled within Lee County, Florida.

14.     Under §3720(b)(2) of the FCA, this Complaint is to be filed *In Camera* and remain under seal for a period of at least sixty (60) days, and shall not be served on the Defendant until to Court so orders. The government may elect to intervene and proceed with the Act within sixty (60) days after it receives both the Complaint and the material evidence and information.

15.     This Court has jurisdiction under 28 U.S.C. §1331.

16.     Venue is proper in the United States District Court for the Middle District of Florida because the Plaintiff resides in, and the Defendant conducts business in, and some or all of the events giving rise to Plaintiff's claims occurred in Lee County, Florida, which are within the Middle District of Florida. Venue is proper in the Fort Myers Division under Local Rule 1.02(b)(5) since Lee County is within the Fort Myers Division.

## PARTIES

17.     Relator **PILARSKI** is a resident of Lee County, Florida. She worked as an occupational therapist for Heritage Healthcare, Inc., and was assigned to work at **BTFM** from July 2016 to November 4, 2016.

18.     Defendant, **BTFM**, is a Delaware limited liability corporation that operates Barrington Terrace of Fort Myers, an assisted living facility directly owned by **ARHC BTFMYFL01 TRS LLC**, a Delaware limited liability company. **BTFM**'s license number is 10100 and AHCA number is 11965763. It is licensed for up to 135 beds. It is further licensed to provide assisted care services, a Medicaid service, and extended congregate care, a specialty license. Nursing services are available at all times.

19.     Defendant **BTFM**'s administrator is **KEATING**.

20.     Defendant **BTFM** is managed by **MADISON**, a Georgia limited liability company.

21.     Defendant **ARBOR** is a Georgia corporation that owns and operates both **BTFM** and **MADISON**. **ARBOR** and/or **HOLDINGS** own and operate at least 30 assisted living facilities across 11 states.

22.     Defendant **HOLDINGS** is a Georgia limited liability corporation that is the parent company of **ARBOR**.

23.     Defendant **HOPE** is a Florida corporation that provides hospice services in Lee County, Florida and has provided, and continues to provide, hospice care to **BTFM** residents.

24.     Defendant Unknown Physicians are those presently unknown physicians that committed violations of the FCA during the Relevant Period.

25.     During the Relevant Period, Defendants, acting with, through and under the supervision of its highest executives and managers, fraudulently submitted and/or caused to be submitted claims to receive monies from the Program knowing of the falsity of such claims and the false and fraudulent misrepresentations contained therein, including false diagnoses.

26.     The policies and procedures carried out by the Defendants in perpetrating these schemes were established and/or ratified at the highest corporate levels of the Defendants.

27.     During the Relevant Period, Defendants acted through its principals, officers, agents and employees, including **KEATING**, and the acts of the other corporate Defendants' principals, officers, agents and employees were within the scope of their agency and employment.

28.     As a result of her employment at **BTFM** (as a contractor since she was an employee of Heritage Healthcare), Relator has first-hand knowledge and information regarding the business operations and fraudulent claims for Program monies paid by the Government Program.

29.     Relator brings this action based on direct and independent knowledge. None of the actionable allegations set forth in this Complaint are based on a public disclosure as set forth in 31 U.S.C. §3730(e)(4). Notwithstanding the same, Relator is an original source for the facts alleged in this Complaint. The facts and circumstances of the Defendants' violations of the FCA have not been publicly disclosed in a criminal, civil, or administrative hearing; nor in any

legislative, administrative, or inspector general report, hearing, audit, or investigation, or in the news media. As a result of his employment, Relator has first-hand knowledge of the business operations of the Defendants and their intentional and/or reckless disregard and fraudulent conduct in connection with their knowledge, supervision and direction of the illegal and fraudulent practices carried out by the Defendants.

30.     When the Relator questioned administrators and supervisors at **BTFM** with her concerns about what was the fraudulent claims for Program monies and the fraudulent retention of monies fraudulently obtained by the Defendants, her concerns were dismissed and she was advised "not to worry about it."

31.     Simultaneously with the filing of this Complaint, as required under the FCA, Relator has provided to the Attorney General of the United States and the United States Attorney for the Middle District of Florida a statement of all of the material evidence and information relating to the Complaint ("Disclosure Statement"). The Disclosure Statement supports the existence of false claims by the Defendants.

## STATUTORY & REGULATORY BACKGROUND

### A. The False Claims Act

32.     The FCA imposes liability upon any person who (a) "knowingly presents or causes to be presented [to the Government] a false or fraudulent claim for payment or approval"; (b) "knowingly makes, uses, causes to be made or used, a false record or statement material to a false or fraudulent claim," or (c) conspired to defraud the Government by getting a false claims allowed or paid, is liable to the United States for a civil penalty of not less than $5,500.00 and not more than $11,000.00, plus three (3) times the amount of damages which the Government sustains because of the act of that person. 31 U.S.C. §3729(a)(1)(A)-(C), as amended.

7

33.     The FCA imposes liability not only for the intentionally false or fraudulent conduct, but also where the conduct is merely "in reckless disregard of the truth or falsity of the information." 31 U.S.C. §3729(b)(1)(A)(iii).

34.     The FCA broadly defines a "claim" as one that includes "any request or demand, whether under a contract or otherwise, for money or property... that... is made to a contractor, grantee or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, if the United States Government- (i) provides or has provided any portion of the money or property requested or demanded; or (ii) will reimburse any portion of the money or property requested or demanded." 31 U.S.C. §3729(b)(2)(A).

35.     The Florida False Claims Act (FFCA) has a nearly identical definition of claim, only substituting Florida or any agency thereof for the United States. F.S. §68.082(1)(b).

**B.  Government Health Care Programs.**

36.     Medicare is a government financial health insurance program administered by the Social Security Administration of the United States. Medicare was promulgated to provide payment for medical services, durable medical equipment and other related health items for individuals 65 and over. Medicare also makes payment for certain health services provided to additional classes of certain individual healthcare patients pursuant to federal regulations.

37.     Medicare has two parts: Part A, the Basic Plan of Hospital Insurance; and Part B, which covers physicians' services and certain other medical services not covered by Part A. Medicare Part A helps cover inpatient care in hospitals, including critical hospitals, and skilled nursing facilities (not custodial or long-term care). Medicare Part A also helps cover hospice care and some health care. Medicare Part B helps cover physicians' services and outpatient care. It

also covers some other medical services that Part A does not cover (i.e. physical and occupational therapist services, etc.). Part B helps pay for covered health services and supplies *when they are medically necessary.*

38.     The federal government enacted the Medicaid program in 1965 as a cooperative undertaking between the federal and state governments to help the states provide healthcare to low income individuals. 42 U.S.C. §§1396-1396v. The Medicaid program pays for services pursuant to plans developed by the states and approved by the U.S. Department of Health and Human Services ("HHS") Secretary through the Center for Medicare and Medicaid Services ("CMS"). States pay doctors, hospitals, pharmacies and other providers and suppliers of medical items and services according to established rates. See 42 U.S.C. §§1396b(a)(1), 1903(a)(1). The federal government then pays each state a statutorily established share of "the total amount expended... as medical assistance under the State plan..." See 42 U.S.C. §1396b(a)(1). This federal-to-state payment is known as federal financial participation ("FFP").

39.     Much of the daily administration and operation of Medicare is managed through private insurers under contract with the federal government (particularly CMS).

40.     Under Medicare Part B, the federal government contracts with insurance companies and other organizations knows as "carriers" to handle payment for physicians' services in specific geographic areas. These private insurance companies, or "Medicare Carriers," are charged with and responsible for accepting Medicare claims, determining coverage, and making payments from the Medicare Trust Fund.

41.     The principal function of both intermediaries and carriers is to make and audit payments for Medicare services to assure that federal funds are spent properly.

42.    To participate in Medicare, providers must assure that their services are provided economically and only when, and to the extent, they are medically necessary. Medicare will only reimburse costs for medical services that are needed for the prevention, diagnosis, or treatment of a specific illness or injury.

**C. Hospice Care.**

43.    According to Title 18, Section 1861 (dd) of the Social Security Act, the term "hospice care" means the following items and services provided to a terminally ill individual by, or by others under arrangements made by, a hospice program under a written plan (for providing such care to such individual) established and periodically reviewed by the individual's attending physician and by the medical director (and by the interdisciplinary group described in paragraph (2)(B)) of the program—

(A) nursing care provided by or under the supervision of a registered professional nurse,

(B) physical or occupational therapy, or speech-language pathology services,

(C) medical social services under the direction of a physician,

(D)(i) services of a home health aide who has successfully completed a training program approved by the Secretary and

(ii) homemaker services,

(E) medical supplies (including drugs and biologicals) and the use of medical appliances, while under such a plan,

(F) physicians' services,

(G) short-term inpatient care (including both respite care and procedures necessary for pain control and acute and chronic symptom management) in an inpatient facility meeting such conditions as the Secretary determines to be appropriate to provide such care, but such

respite care may be provided only on an intermittent, nonroutine, and occasional basis and may not be provided consecutively over longer than five days,

(H) counseling (including dietary counseling) with respect to care of the terminally ill individual and adjustment to his death, and

(I) any other item or service which is specified in the plan and for which payment may otherwise be made under this title.

44.     The care and services described in subparagraphs (A) and (D) may be provided on a 24-hour, continuous basis only during periods of crisis (meeting criteria established by the Secretary) and only as necessary to maintain the terminally ill individual at home.

45.     To be eligible to elect the Medicare hospice benefit, beneficiaries must be certified by their attending physician (if any) and by the hospice physician as being terminally ill with a prognosis of 6 months or less to live, should the illness run its normal course.

46.     Expenditures for the Medicare hospice benefit have increased approximately $1 billion per year. In fiscal year (CY) 1998, expenditures for the Medicare hospice benefit were $2.2 billion, while in CY 2008, expenditures for the Medicare hospice benefit were $11.2 billion.

47.     In 1998, the average length of stay (LOS) for hospice patients was 48 days, but by 2006 it had risen to 73 days (a 52% increase). Since 2006, the average LOS has begun to decline slightly, dropping to 71 days in 2008, which is a 48% increase from 1998. Charts 1 and 2 show that the average LOS varies by diagnosis. For the top twenty diagnoses in 2008, the average LOS ranged from 28 days for chronic kidney disease to 105 days for Alzheimer's disease and other degenerative conditions.

48.     The Social Security Act in section 1861(dd) and Federal regulations in 42 CFR §418.106 and §418.202(f) require hospice programs to provide individuals under hospice care

with drugs and biologicals related to the palliation and management of the terminal illness as defined in the hospice plan of care. Medicare payment is made to the hospice for each day an eligible beneficiary is under the hospice's care, regardless of the amount of services provided on any given day.

49.     Medicare hospice providers are required to conduct and document a patient-specific comprehensive assessment in writing.

50.     With passage of the Affordable Care Act in March 2010, Congress required hospice physicians or hospice nurse practitioners to have a face-to-face encounter with Medicare hospice patients prior to the 180th-day recertification and every recertification thereafter, and to attest that the encounter occurred.

51.     This new face-to-face encounter requirement became effective on January 1, 2011. In the August 4, 2011, FY 2012 Hospice Wage Index final rule (76 FR 47302), CMS further clarified that any hospice physician could conduct the face-to-face encounter, and that the attestation of the hospice clinician performing the encounter must note that the clinical findings of the visit were provided to the certifying physician, for use in determining continuing eligibility for hospice services.

52.     On March 31, 2008, the Office of Inspector General (OIG) issued a Memorandum Report on March 31, 2008, entitled "Hospice Beneficiaries' Use of Respite Care" (OEI 02-06-00222), which noted that providing respite care to Medicare hospice beneficiaries who reside in nursing facilities is inappropriate.

53.     On October 7, 2011, CMS issued CR 7478, which noted that when a face-to-face encounter is untimely, the beneficiary is not considered terminally ill for Medicare purposes due to lack of recertification, and therefore is not eligible for the hospice benefit. This CR required

that a hospice must discharge the patient from the Medicare hospice benefit but can re-admit once the encounter occurs. Where the only reason the patient ceases to be eligible for the Medicare hospice benefit is the hospice's failure to meet the face-to-face requirement, CMS expects the hospice to continue to care for the patient at its own expense until the required encounter occurs, enabling the hospice to re-establish Medicare eligibility.

54.     An individual is considered to be terminally ill if the medical prognosis is that the individual's life expectancy is 6-months or less if the illness runs its normal course.  Only care provided by (or under arrangements made by) a Medicare certified hospice is covered under the Medicare hospice benefit. The hospice admits a patient only on the recommendation of the medical director in consultation with, or with input from, the patient's attending physician (if any). In reaching a decision to certify that the patient is terminally ill, the hospice medical director must consider at least the following information:

(i) Diagnosis of the terminal condition of the patient.

(ii) Other health conditions, whether related or unrelated to the terminal condition.

(iii) Current clinically relevant information supporting all diagnoses.

55. Section §1814(a)(7) of the Social Security Act (the Act) specifies that certification of terminal illness for hospice benefits shall be based on the clinical judgment of the hospice medical director or physician member of the interdisciplinary group (IDG) and the individual's attending physician, if he/she has one, regarding the normal course of the individual's illness. No one other than a medical doctor or doctor of osteopathy can certify or re-certify a terminal illness.

56. For the duration of the election of hospice care, an individual must waive all rights to

13

Medicare payments for any Medicare services that are related to the treatment of the terminal condition for which hospice care was elected or a related condition.

57.     For the subsequent periods, recertifications may be completed up to 15 days before the next benefit period begins.  For subsequent periods, the hospice must obtain, no later than 2 calendar days after the first day of each period, a written certification statement from the medical director of the hospice or the physician member of the hospice's IDG.  If the hospice cannot obtain written certification within 2 calendar days, it must obtain oral certification within 2 calendar days.  When making an oral certification, the certifying physician(s) should state that the patient is terminally ill, with a prognosis of 6 months or less.  Because oral certifications are an interim step sometimes needed while all the necessary documentation for the written certification is gathered, it is not necessary for the physician to sign the oral certification. Hospice staff must make an appropriate entry in the patient's medical record as soon as they receive an oral certification.

58.     The hospice must obtain written certification of terminal illness for each benefit period, even if a single election continues in effect. A written certification must be on file in the hospice patient's record *prior* to submission of a claim to the Medicare contractor. Clinical information and other documentation that support the medical prognosis must accompany the certification and must be filed in the medical record with the written certification.  Initially, the clinical information may be provided verbally, and must be documented in the medical record and included as part of the hospice's eligibility assessment.

59.     The attesting physician must also include a narrative description of the terminal illness(es) and must reflect the patient's individual clinical circumstances and cannot contain check boxes or standard language used for all patients.  The physician must synthesize the

14

patient's comprehensive medical information in order to compose this brief clinical justification narrative.

60.     For recertifications on or after January 1, 2011, which must be done face-to-face, the narrative associated with the third benefit period recertification and every subsequent recertification must include an explanation of why the clinical findings of the face-to-face encounter support a life expectancy of 6 months or less.

61.     Failure to meet the face-to-face encounter requirements specified in this section results in a failure by the hospice to meet the patient's recertification of terminal illness eligibility requirement.

**DEFENDANTS' FRAUDULENT SCHEMES & SUBMISSION OF FALSE CLAIMS**

62.     Based upon her unique position as an occupational therapist, **PILARSKI** was able to, and did, observe the Defendants submission of false claims to the government.

63.     As the exclusive hospice provider in Lee County, Florida, **HOPE** provides all of the hospice care county-wide, including to patients at **BTFM**. **HOPE** receives monies from Government Programs for the hospice services provided to **BTFM** patients. **BTFM** does not receive monies from Government Programs but instead receives payment from patients themselves in the form of room and board. That is because **BTFM** is only licensed as an assisted living facility and thus cannot retain patients whose required level of care exceeds that licensure; that is, unless there is a hospice diagnosis and **HOPE** then provides hospice care. A hospice diagnosis for a patient whose required care exceeds the licensure of an assisted living facility allows a facility like **BTFM** to retain the patient if a hospice provider is retained and thus **BTFM** is able to retain that source of income while also benefitting **HOPE**, who then bills and collects monies from Government Programs.

64.     Upon beginning to provide services at **BTFM**, **PILARSKI** was provided with a patient list that included identification of those patients that were on hospice (through **HOPE**).

65.     In preparing to provide care, **PILARSKI** went back to check the patients' histories and noticed that despite **BTFM**'s and **HOPE**'s attestations that the patients were terminally ill and likely to become deceased within 6-months, the exact same patients who were on hospice in March 2016 were still alive and again on hospice in November 2016.

66.     When **PILARSKI** asked staff at **BTFM** about this, **BTFM** staff casually laughed it off and informed her that it "happens all the time" and that one patient had been on hospice at **BTFM** for more than two years.

67.     It was further disclosed to **PILARSKI** that not only were the hospice patients fraudulently certified as likely to become deceased within 6-months, but many, if not all, were certified as "hospice" despite not meeting the other objective criteria necessary to sustain a hospice diagnosis.

68.     Furthermore, **PILARSKI** was instructed to provide rehabilitative care to these "hospice" patients despite the same not being proper or necessary if they were truly likely hospice-eligible.

69.     In fact, **PILARSKI** observed that a great many of these "hospice" patients were not close to becoming deceased at all but rather suffered from early stages of degenerative diseases such as Alzheimer's that were nowhere near causing the patient to become deceased, nor end-of-life.

70.     For example, when **PILARSKI** arrived at **BTFM**, she was informed by **BTFM** staff not to say anything to the family of a patient referred to as "Coach" regarding the therapy

because he is on hospice and getting medication paid for through hospice, and thus the patient's family didn't want to lose the benefit.

71.     On another occasion while working at **BTFM**, **PILARSKI** inquired of a nurse as to who was on hospice. The nurse informed **PILARSKI** of the patients on hospice and said many have been on a very long time.

72.     On another occasion, **PILARSKI** encountered a patient who kept falling out of his wheelchair in **BTFM**'s in memory care unit. In response, **PILARSKI** called for a wheelchair specialist to come and measure the patient. When the specialist arrived, **BTFM** staff informed him that the patient was on hospice, which meant that the order for another wheelchair could not be done by **BTFM**. This patient was not at all near the end of his life but rather required additional care. However, because **BTFM** did not have the necessary staff to assist the patient, it instead had him placed on hospice and thus had **HOPE** to assist the patient, which allowed the patient to stay at **BTFM** far longer than appropriate in order for them to collect Program monies.

73.     Thereafter, **PILARSKI** began to become suspicious that **BTFM** and **HOPE** were conspiring to fraudulently obtain hospice diagnoses for patients in order to generate revenue from Program monies. One day while working at **BTFM**, **PILARSKI** noticed a paper located in the nursing station on the wall with all the hospice patients listed. **PILARSKI** noticed that there were over twenty (20) patients on hospice in such a small unit, most of whom have been on hospice well over eight (8) months.

74.     **PILARSKI** has knowledge that "Coaches" family is using hospice to pay for medicine and has been on hospice for perhaps several years. **PILARSKI** has knowledge that the two patients she was going to order wheel chairs for were put on hospice for extra care of

bathing and activities of daily living, not because they were going to become deceased in six (6) months or less, and to retain them in the building for Program monies.

75.     By comparison, **PILARSKI** has worked in larger locked memory care units in Illinois such as Symphony of Buffalo Grove, previously Claremont; which has 75 beds; and at the most 3-4 people were on hospice. At Whitehall, there were approximately 30 beds and at most 2-3 patients were on hospice.

76.     Additionally, when **PILARSKI** encountered a hospice patient who was unable to stand without substantial assistance, **PILARSKI** requested **BTFM** procure a Hoyer Lift in order to ensure the patient could safely be moved without a greater risk of the patient falling. However, when **PILARSKI** made such a request, **BTFM** informed her that they were an assisted living facility and that **PILARSKI** could not order the Hoyer Lift, despite the same being the appropriate standard of care given the patient's inability to stand on their own. When **PILARSKI** reiterated that the Hoyer Lift was needed, **BTFM**'s admitting department informed her that she was not permitted to make the request because the patient would have had to be transferred to a skilled nursing facility. **KEATING** then contacted Heritage Healthcare and advised that **BTFM** no longer wanted **PILARSKI** working there.

77.     As a therapist, **PILARSKI** learned hospice is only appropriate for end of life patients, and that it is not to be used for payment of medication or to receive extra care, or so facility doesn't have to hirer extra workers.

78.     The hospice patients at **BTFM**, and who are treated by **HOPE**, are not bona fide end-of life and thus do not meet the standards necessary to sustain a hospice diagnosis and thus receive Program monies.

18

79.     Instead, **BTFM**, in collusion with all Defendants, conspired with **HOPE** to obtain hospice diagnoses for its long-term care patients that should have been moved to a skilled nursing facility rather than an assisted living facility.

80.     In so doing, the Defendants all insured that they would be in receipt of fraudulently obtained monies and all have assisted and conspired with **HOPE** to achieve fraudulent hospice diagnoses for **BTFM** patients in order for **HOPE** to fraudulently bill and collect Program monies. By doing that, **BTFM** reaped the benefits of **HOPE**'s fraud by retaining patients it legally could not have but for the fraudulent hospice diagnoses.

81.     The Defendants' caused a standard operating procedure through all of its locations to fraudulently obtain hospice diagnoses for its long-term care patients that should have been moved to a skilled nursing facility rather than an assisted living facility in order to obtain Program monies.

82.     Upon information and belief, the physicians employed by the Defendants to certify patients being end-of-life, and thus in need of hospice care, failed to properly visit such patients face-to-face and/or failed to properly document the reasons for the certification of a hospice diagnosis as required in order to properly obtain payment of Program monies.

83.     Furthermore, the Defendants caused the submission of claims and the payment of Program monies where hospice patients were actually being treated for their terminal illnesses. Simply put, upon information and belief, where the Defendants rendered treatment to a hospice patient for a hospice ailment, the Defendants would frequently instead submit fraudulent claims to the Program by claiming the services rendered were for non-hospice ailments.

## COUNT I- DAMAGES & PENALTIES UNDER THE FCA

**(Defendants' Violation of 31 U.S.C. §3729(a)(1), as amended, 31 U.S.C. §3729(a)(1)(A)**

84.    Relator incorporates by reference the allegations paragraphs 1-83 as if fully set forth in this Count.

85.    From at least 2011 to present, the Defendants violated the FCA, 31 U.S.C. §3729(a)(1), and as amended, by knowingly, in reckless disregard or deliberate ignorance of the truth or falsity of the information it conveyed, presented or caused to be presented false or fraudulent claims for payment or approval to the United States.

86.    The claims were fraudulent because the Defendants made requests or demands for payment from the Program where: (a) the claims contained false and fraudulent information regarding the true diagnosis for Medicare/Medicaid patients, (b) the claims contained false and fraudulent information regarding hospice diagnoses for its patients, and (c) the claims contained false and fraudulent information regarding the true life expectancy and/or mortality likelihood of patients. All of these were fraudulent attestations by the Defendants in order to receive Program monies.

87.    The monies the Defendants obtained through their false or fraudulent submissions to the Program were provided in whole or in part by the United States.

88.    The United States and Florida were unaware of the falsity of the claims and/or statements which the Defendants submitted and/or caused to be submitted to the United States and in reliance on the accuracy thereof, paid the Defendants for reimbursement that otherwise would not have been paid and/or were ineligible for payment.

89.    The United States and Florida, being unaware of the falsity of the claims and/or statements caused to be made by the Defendants and in reliance on the accuracy thereof, paid and continues to pay the Defendants for Program monies that would otherwise not have been paid and/or were ineligible for payment.

90.     The Defendants' compliance with the Program, Medicare and state regulations was material to the United States' and Florida's decision to disburse funds to the Defendants.

91.     By reason of the Defendants' wrongful conduct, the United States has suffered and continues to suffer substantial damages.

WHEREFORE, the Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the United States:

    1)            Three times the amount of actual damages which the United States has sustained as a result of the Defendants' conduct;

    2)            A civil penalty of not less than $5,500.00 and not more than $11,000.00 for each false claim which the Defendants caused to be submitted to the United States;

    3)            Prejudgment Interest;

    4)            All costs incurred in bringing this action.

To the Relator:

    1)  The maximum amount allowed pursuant to §3730(d) of the FCA and/or any other applicable provision of law;

    2)  Reimbursement for reasonable expenses which Relators incurred in connection with this action;

    3)  An award of reasonable attorney's fees and costs, and;

    4)  Such further relief as this Court deems equitable and just.

## COUNT II- DAMAGES & PENALTIES UNDER THE FCA

**(Defendants' Violation of 31 U.S.C. §3729(a)(1), as amended, 31 U.S.C. §3729(a)(1)(B)**

92.     Relator incorporates by reference the allegations paragraphs 1-83 as if fully set forth in this Count.

93.     From at least 2011 to present, the Defendants violated the FCA, 31 U.S.C. §3729(a)(1), and as amended, by knowingly, in reckless disregard or deliberate ignorance of the truth or falsity of the information it conveyed, presented or caused to be presented false or fraudulent claims for payment or approval to the United States.

94.     The claims were fraudulent because the Defendants made requests or demands for payment from the Program where: (a) the claims contained false and fraudulent information regarding the true diagnosis for Medicare/Medicaid patients, (b) the claims contained false and fraudulent information regarding hospice diagnoses for its patients, and (c) the claims contained false and fraudulent information regarding the true life expectancy and/or mortality likelihood of patients. All of these were fraudulent attestations by the Defendants in order to receive Program monies.

95.     The monies the Defendants obtained through their false or fraudulent submissions to the Program were provided in whole or in part by the United States.

96.     The United States and Florida were unaware of the falsity of the claims and/or statements which the Defendants submitted and/or caused to be submitted to the United States and in reliance on the accuracy thereof, paid the Defendants for reimbursement that otherwise would not have been paid and/or were ineligible for payment.

97.     The United States and Florida, being unaware of the falsity of the claims and/or statements caused to be made by the Defendants and in reliance on the accuracy thereof, paid

and continues to pay the Defendants for Program monies that would otherwise not have been paid and/or were ineligible for payment.

98.     The Defendants' compliance with the Program, Medicare and state regulations was material to the United States' and Florida's decision to disburse funds to the Defendants.

99.     By reason of the Defendants' wrongful conduct, the United States has suffered and continues to suffer substantial damages.

WHEREFORE, the Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the United States:

1) Three times the amount of actual damages which the United States has sustained as a result of the Defendants' conduct;

2) A civil penalty of not less than $5,500.00 and not more than $11,000.00 for each false claim which the Defendants caused to be submitted to the United States;

3) Prejudgment Interest;

4) All costs incurred in bringing this action.

To the Relator:

1) The maximum amount allowed pursuant to §3730(d) of the FCA and/or any other applicable provision of law;

2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

3) An award of reasonable attorney's fees and costs, and;

4) Such further relief as this Court deems equitable and just.

## COUNT III- DEFENDANTS' VIOLATION OF THE FLORIDA FALSE CLAIMS ACT

100.    Relator incorporates by reference the allegations in paragraphs 1-83 as if fully set forth in this paragraph.

101.    This is a *qui tam* action brought by the Relators on behalf of the State of Florida to recover treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. §68.081 *et seq.*

102.    Fla. Stat. §68.082(2) provides liability for any person who:

(a)    Knowingly presents or causes to be presented to an officer or employee of an agency a false or fraudulent claim for payment or approval;

(b)    Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by an agency.

103.    From at least 2011 to present, the Defendants violated the Florida FCA (FFCA) Fla. Stat. §68.082(2) by knowingly, in reckless disregard or deliberate ignorance of the truth or falsity of the information they conveyed, presented or caused to be presented false or fraudulent claims for payment or approval to the State of Florida.

104.    From at least 2011 to present, the Defendants violated the FFCA, Fla. Stat. §68.082(2)(b) by knowingly, in reckless disregard or deliberate ignorance of the truth or falsity of the information they conveyed, presented or caused to be made or used a false record or statement material to a false or fraudulent claim paid or approved by an agency.

105.    The claims were fraudulent because the Defendants made requests or demands for payment from the Program where: (a) the claims contained false and fraudulent information regarding the true diagnosis for Medicare/Medicaid patients, (b) the claims contained false and fraudulent information regarding hospice diagnoses for its patients, and (c) the claims contained false and fraudulent information regarding the true life expectancy and/or mortality likelihood of

24

patients. All of these were fraudulent attestations by the Defendants in order to receive Program monies.

106.   The monies the Defendants obtained through their false or fraudulent submissions to the Program were provided in whole or in part by the State of Florida.

107.   The State of Florida was unaware of the falsity of the claims and/or statements which the Defendants submitted and/or caused to be submitted to the United States and in reliance on the accuracy thereof, paid the Defendants for reimbursement that otherwise would not have been paid and/or were ineligible for payment.

108.   The State of Florida, being unaware of the falsity of the claims and/or statements caused to be made by the Defendants and in reliance on the accuracy thereof, paid and continues to pay the Defendants for Program monies that would otherwise not have been paid and/or were ineligible for payment.

109.   Compliance with applicable Medicare, Medicaid and the various other federal and states laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Florida by the Defendants. Compliance with applicable Florida statutes/regulations was also an express condition of payment of claims submitted to the State of Florida.

110.   Had the State of Florida known that the false representations were made by the Defendants, it would not have paid the claims.

111.   As a result of the Defendants' violations of Fla. Stat. §68.082(2), the State of Florida has been damaged.

112.     Relator has direct and independent knowledge of the allegations of this Complaint and has brought this action pursuant to Fla. Stat. §68.083(2) on behalf of himself and the State of Florida.

WHEREFORE, the Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the United States:

1) Three times the amount of actual damages which the State of Florida has sustained as a result of the Defendants' conduct;

2) A civil penalty of not less than $5,500.00 and not more than $11,000.00 for each false claim which the Defendants caused to be submitted to the State of Florida;

3) Prejudgment Interest;

4) All costs incurred in bringing this action.

To the Relator:

1) The maximum amount allowed pursuant to Fla. Stat. §68.085 and/or any other applicable provision of law;

2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

3) An award of reasonable attorney's fees and costs, and;

4) Such further relief as this Court deems equitable and just.

## DEMAND FOR JURY TRIAL

**NOW COMES** the Plaintiff/Relator, **SANDRA PILARSKI,** by and through her undersigned attorney, and demands a jury trial under Federal Rule of Civil Procedure 38 on all issues triable of right by a jury in this action.

Respectfully submitted,

Dated: March 22, 2017

Benjamin H. Yormak
Florida Bar Number 71272
Trial Counsel for Relator
YORMAK EMPLOYMENT & DISABILITY LAW
9990 Coconut Road
Bonita Springs, Florida 34135
Telephone: (239) 985-9691
Fax: (239) 288-2534
Email: byormak@yormaklaw.com